UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Flo-Pro Inc.

        v.                          Civil No. 11-cv-158-JL
                                    Opinion No. 2011 DNH 155
10 Iron Horse Drive, LLC and
First American Realty, Inc.

**MEMORANDUM ORDER**

This is a commercial landlord-tenant dispute.  The
plaintiff, Flo-Pro, Inc., has sued its landlord, 10 Iron Horse
Drive, LLC, and its property manager, First American Realty,
Inc., claiming that Iron Horse wrongfully terminated its lease
with Flo-Pro for its failure to furnish the required security
deposit following the assignment of the lease to Iron Horse from
the original landlord, Circle Drive Associates, LLC.  Flo-Pro had
furnished the security deposit to Circle Drive in the form of a
standby letter of credit benefitting it, but never effected an
assignment of that instrument to Iron Horse, nor the issuance of
a new letter of credit benefitting Iron Horse.

Flo-Pro alleges that it has always been "ready, willing and
able" to obtain a letter of credit benefitting Iron Horse, but
that Iron Horse prevented Flo-Pro from doing so by refusing to
relinquish the letter of credit benefitting Circle Drive, which
had come into Iron Horse's possession when it bought the premises

from Circle Drive.  Flo-Pro claims that this amounted to a breach
of the lease, or at least a breach of its implied covenant of
good faith and fair dealing, excusing Flo-Pro from its obligation
to furnish the security deposit.[1]  Accordingly, Flo-Pro argues
that Iron Horse could not have terminated the lease on account of
Flo-Pro's failure to provide the security deposit, and has moved
for a preliminary injunction preventing Iron Horse from entering
or taking possession of the premises.  See Fed. R. Civ. P. 65(a).

In response, the defendants have moved to dismiss for lack
of subject-matter jurisdiction, see Fed. R. Civ. P. 12(b)(1),
arguing that federal courts lack "jurisdiction to adjudicate
summary eviction actions" or should abstain from exercising
whatever jurisdiction there is "because the landlord-tenant
relationship is fundamentally a matter of state law."  The
defendants also argue that, in any event, Iron Horse properly
terminated the lease because of Flo-Pro's default in failing to
provide the security deposit.  Iron Horse further explains that
it was under no obligation to give Flo-Pro the letter of credit
benefitting Circle Drive.

---

[1]The complaint alleges that Iron Horse's actions also
violated Article 5 of New Hampshire's version of the Uniform
Commercial Code, N.H. Rev. Stat. Ann. § 382-A:5, and its statute
on tenant security deposits, id. § 540-A:6, but Flo-Pro withdrew
those claims at the hearing, at least as a basis for its motion
for preliminary injunction.

This court held an evidentiary hearing on Flo-Pro's motion for preliminary injunction on August 26, 2011, when each side presented the testimony of a single witness.  Despite the defendants' creative argument, this court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1):  the citizenship of the parties is completely diverse and the amount in controversy exceeds $75,000.  Even assuming that federal courts lack subject-matter jurisdiction over summary eviction actions, this is not a summary eviction action, but a contract dispute, and the fact that the contract happens to be a lease for real property provides no basis for abstention.  So, as fully explained below, the defendants' motion to dismiss for lack of subject-matter jurisdiction is denied.

As also fully explained below, however, Flo-Pro's motion for a preliminary injunction is denied.  It is undisputed that, following the assignment of the lease to Iron Horse, Flo-Pro never furnished Iron Horse with the security deposit required by the lease.  It is likewise undisputed that, after Iron Horse notified Flo-Pro of this default, Flo-Pro failed to cure it, entitling Iron Horse to terminate the lease.  While Flo-Pro tries to blame its failure to furnish the security deposit on Iron Horse's refusal to return the letter of credit benefitting Circle Drive, Flo-Pro has not shown that Iron Horse had any obligation,

3

either express or implied, to do so.  Because Flo-Pro has not shown the requisite likelihood of success on its claim that Iron Horse wrongfully terminated the lease, the motion for preliminary injunction must be denied.

## I.   **Background**

For purposes of the motion for preliminary injunction, the court makes the following findings of fact, see Fed. R. Civ. P. 52(a), based on the testimony and exhibits received at the evidentiary hearing, as well as the materials submitted beforehand, see Asseo v. Pan Am. Grain Co., 805 F.2d 23, 26 (1st Cir. 1986) (noting with approval that "[a]ffidavits and other hearsay materials are often received in preliminary injunction proceedings"); see also Ligotti v. Garofolo, 562 F. Supp. 2d 204, 207 (D.N.H. 2008).

Flo-Pro, as tenant, and Circle Drive, as landlord, entered into a written lease for more than 150,000 square feet of industrial and office space in Bedford, New Hampshire, in 2007. The lease, as amended and restated in April 2009, had an initial term of five years and could be extended for another five years at Flo-Pro's option.  Flo-Pro, based in Toronto, is a subsidiary of Fenwick Automotive Products Limited, a leader in the North American market for replacement auto parts.

4

In section 17.5(a), the lease provides that Fenwick

> shall deposit with Landlord or shall maintain the
> issuance of a standby letter of credit in substantially
> the form attached were to [*sic*] as Exhibit C, in the
> amount of One Hundred Fifty Thousand Dollars as
> security for the full and faithful performance of
> Tenant's obligations hereunder (the "<u>Security
> Deposit</u>").  Upon termination of this Lease, and
> provided [Flo-Pro] is not in default hereunder and has
> performed all of the conditions of this Lease, Landlord
> shall return the Security Deposit to [Fenwick] . . . .

(parenthetical omitted).[2]  Section 17.5(b) of the lease provides:

> Should Landlord convey its interest under this Lease
> and such grantee or transferee acknowledges in writing
> that it is bound by the terms of this Lease in respect
> of the application and return of the said Security
> Deposit, Landlord may turn over the Security Deposit to
> its grantee or transferee, in which case Tenant and
> [Fenwick] shall release Landlord from all liability
> with respect to the Security Deposit, its application
> and return.

The lease further provides that, "[i]f any default by Tenant

continues after notice by Landlord . . . for more than thirty

days after notice, or longer if commencement of the cure begins

within thirty days after notice and Tenant diligently pursues

cure thereafter . . . Landlord may . . . at any time while such

default exists . . . terminate this Lease by notice to Tenant."

---

[2]Neither party supplied the court with Exhibit C, but Iron
Horse represented--and Flo-Pro did not dispute--that Exhibit C
was essentially the same as, if not identical to, the letter of
credit that Fenwick obtained for the benefit of Circle Drive.

As contemplated by section 17.5(a), Fenwick applied for a standby letter of credit for Circle Drive's benefit in the amount of $150,000, which issued from Royal Bank of Canada on October 29, 2007.  The letter of credit later underwent two amendments, the second of which occurred on July 16, 2009.  This second amendment extended the letter's expiration date from October 29, 2010 to December 31, 2014.

Circle Drive eventually entered into an agreement with First American for the assignment of Circle Drive's interest in the lease.  At Circle Drive's request, on June 8, 2010, Flo-Pro delivered to First American a "Tenant Estoppel Certificate."[3] The certificate stated, in relevant part, that Flo-Pro's

> security deposit is an irrevocable Letter of Credit from Royal Bank of Canada ["RBC"] in the amount of One Hundred Fifty Thousand Dollars.  [Flo-Pro] agrees to arrange for [Fenwick] to facilitate the assignment/re-issuance of the LOC to Buyer under the same terms and conditions as currently exist provided that Buyer acknowledges in writing that it is bound by the terms of the Lease in respect of the application and return of the Security Deposit as defined and contemplated in the Lease.

---

[3]Section 18.7 of the lease, entitled "Estoppel Certificate," requires Flo-Pro to execute and deliver a written certification that, among other things, the lease is in full force and effect and that neither party is in default (or, if there is a default, identifying it).  This section also states that such a certificate "may be relied upon" by any prospective purchaser, mortgagee, or assignee of the premises or the lease.

(parentheticals omitted).  The estoppel certificate stated that it "may be relied upon by," among others, "Buyer," which was defined as First American "or its nominee."

On the next day, June 9, 2010, Circle Drive assigned its interest in the lease to Iron Horse, and delivered a deed to the premises.  Circle Drive further provided Iron Horse with an "agree[ment] to the assignment or re-issuance" of the letter of credit that Flo-Pro had obtained for Circle Drive's benefit, as well as physical possession of the original letter of credit and its first amended version.  But Circle Drive did not give Iron Horse the second amended version of the letter of credit at this time, because (as Circle Drive did not discover until later) it had inadvertently misplaced that document.

That same day, Iron Horse confirmed to Flo-Pro in writing, as contemplated by section 17.5(b) of the lease, "that we are bound by the terms of the Lease in respect of the application and return of the Security Deposit . . . .  Kindly take such steps as are required to have the issuer [of the letter of credit] acknowledge the assignment to us or to have them re-issue [it] to [Iron Horse]."  In response, Fenwick explained that "[i]t would be convenient if [Iron Horse] could return" the letter of credit to Fenwick, which had to "co-ordinate with three different branches in the bank to cancel" the letter of credit "and have

7

them issue a new one in replacement."  Iron Horse, in turn, asked Fenwick whether the bank would commit to issuing the replacement letter of credit before receiving the old one or, if not, how long the replacement process would take "so that the time period we are without the [letter of credit] in hand is minimized."

After more than a month had passed, Fenwick responded that, per the bank, "change of beneficiary is a time consuming process and they will consider it at the time of renewal.  The present [letter of credit] expires on Oct[.] 29, 2010."  This second statement was incorrect--by virtue of the second amendment, the expiration date of the letter of credit had been extended to December 31, 2014--but Iron Horse did not realize that at the time because, as just discussed, Circle Drive had mistakenly failed to give Iron Horse the second amendment.  After another month had passed, Fenwick told Iron Horse that the new letter of credit would be issued from a different bank, M&T.

After two more months passed without the issuance of the new letter of credit or any further meaningful communications from Flo-Pro, Iron Horse sent Flo-Pro a written notice of default in the manner contemplated by the lease on Friday, January 14, 2011. The notice stated that Flo-Pro was in default for its failure "to provide a standby letter of credit as security deposit."  At this point, to Iron Horse's knowledge, even the letter of credit

issued for the benefit of Circle Drive was no longer in effect, having expired on October 29, 2010.  In response to the notice, Fenwick told Iron Horse that it had "the following options": returning the letter of credit to either Fenwick or to the issuing bank.  Iron Horse responded by returning the letter of credit to Fenwick on January 20, 2011, noting that this action "should not be construed as a waiver of our default notice or demand to immediately replace the expired" letter of credit.

Over the next two weeks, Iron Horse repeatedly asked Fenwick when the new letter of credit would be issued, but received no response aside from one e-mail, on February 9, 2011, that "the original LC has now been located.  We are in the process of getting this to" RBC.  The very next day, however, Iron Horse learned of the existence of the second amended version of the letter of credit.  This news came from Circle Drive, which related that Flo-Pro had recently asked for the return of that instrument to it, rather than to Iron Horse.  In response, Iron Horse told Circle Drive to send the second amended version to Iron Horse, which Circle Drive did.

Iron Horse explains that Fenwick's "conduct in failing to disclose to Iron Horse the existence of the Second Amendment . . . and seeking its return directly from Circle Drive le[d] Iron Horse to reasonably believe that [Fenwick] intended to

return the Letter of Credit to RBC and direct whatever collateral [Fenwick] had granted RBC as security for the Letter of Credit [to] other corporate purposes without furnishing Iron Horse with the $150,000 security deposit" (parentheticals omitted).  For this reason, Iron Horse has yet to return the second amended version of the letter of credit to Fenwick.  Flo-Pro has yet to provide Iron Horse with a letter of credit, or cash, to serve as the security deposit under the lease, and conceded at the hearing that Iron Horse was not in possession of a security deposit.[4]

On February 17, 2011, one week after learning that Flo-Pro had asked Circle Drive to return the second amendment to the letter of credit to Flo-Pro, Iron Horse sent Flo-Pro a written notice of the termination of the lease.  The notice stated that, after having been previously notified of its default "for failure to cause a letter of credit or cash to be provided to [Iron Horse] as a security deposit," Flo-Pro had yet to cure that default.  The notice demanded that Flo-Pro surrender the premises within thirty days and pay "all of the sums which [Flo-Pro] covenanted in the lease to pay."

---

[4]In response to questions from the court as to whether Iron Horse had a security deposit at present, counsel for Flo-Pro stated, "I don't think they do but I believe they have the ability to get one pretty easily."

Flo-Pro responded with a letter asserting that it had "complied with Section 17.5 of the lease in light of the delivery to [its] former landlord of the original" letter of credit.  Flo-Pro also stated that it was "ready and willing to procure a replacement letter of credit with the current landlord named as the beneficiary" but explained that "to do so the original [letter of credit] must first be cancelled and the cash collateral . . . must be released by RBC" so that it could be furnished to M&T, the bank to which Fenwick planned to apply for the new letter of credit.  Flo-Pro complained that to obtain a new letter of credit before cancelling the old one would "require increasing the security posted to a total of $300,000," rather than the $150,000 called for by the lease.

In its response to this letter, Iron Horse disputed the assertion that Flo-Pro was in compliance with section 17.5, but offered "to enter into discussions regarding a new lease, on terms acceptable to [Iron Horse] at its sole discretion," provided that Flo-Pro furnished the security deposit in cash and paid Iron Horse the legal fees generated by the dispute so far. While the parties had some further discussions (including immediately prior to the preliminary injunction hearing) no agreement was reached.  Flo-Pro commenced this action against Iron Horse and First American, as well as Circle Drive, on April

11

1, 2011, filing a verified complaint and motion for preliminary injunction to prevent the defendants from entering or taking possession of the leased premises "or exercising any self-help remedies."  Flo-Pro has since stipulated to the dismissal of its claims against Circle Drive with prejudice.

## II.  **Analysis**

### A.  **Subject-matter jurisdiction**

As noted at the outset, the defendants have moved to dismiss this case for lack of subject-matter jurisdiction.  They do not question that the elements of diversity jurisdiction are present. Flo-Pro is a Delaware corporation with its principal place of business outside the United States, and therefore is treated as a Delaware citizen for purposes of diversity jurisdiction.  See 28 U.S.C. § 1332(c)(1); 13F Charles Alan Wright et al., Federal Practice and Procedure § 3628, at 183-184 (3d ed. 2009) (noting the majority view that a domestic corporation with its principal place of business abroad has the citizenship of its state of incorporation only for purposes of diversity).  Iron Horse, a limited liability company, has the citizenship of each of its members, see Pramco, LLC ex rel. CFSC Consortium, LLC v. San Juan Bay Marina, Inc., 435 F.3d 51, 54-55 (1st Cir. 2006), none of which are Delaware citizens; that includes its managing member,

First American, a Massachusetts corporation with its principal place of business there.  Finally, in addition to claims for damages, Flo-Pro's complaint seeks a declaratory judgment that it is not in breach of the lease even though it has not obtained a $150,000 letter of credit benefitting Iron Horse.  So "the value of the right [the plaintiff] seeks to vindicate"--and hence the amount in controversy for purposes of diversity jurisdiction--exceeds $75,000.  Dep't of Recreation & Sports of P.R. v. World Boxing Ass'n, 942 F.2d 84, 89 (1st Cir. 1991).

The defendants do not dispute any of these conclusions. Instead, they argue that "Federal courts lack subject-matter jurisdiction to adjudicate summary eviction actions, since federal courts cannot entertain summary proceedings."  As the defendants point out, New Hampshire law, like that of many other states, provides for a special form of action, known as a "possessory action," to recover possession of real estate against a tenant or other person holding it "without right."  N.H. Rev. Stat. Ann. § 540:12.  To commence such an action, "[a] writ of summons may be issued, returnable to the [state] district court," id. § 540:13, I, which must conduct a hearing on the merits within 10 days of the tenant's appearance, see id. § 540:13, V (unless the parties elect to engage in discovery, which is conducted on an abbreviated schedule, see N.H. Dist. Ct. R. 5.6).

13

As the New Hampshire Supreme Court has explained, "[t]he purpose of [these] summary process proceedings is to permit the landlord to recover possession on termination of a lease without suffering the delay, loss and expense to which he may be subjected under a traditional common-law action." Matte v. Shippe Auto, Inc., 152 N.H. 216, 218 (2005) (quotation formatting omitted).

The defendants are correct, then, that New Hampshire law establishes summary proceedings for possessory actions. As they also point out, some federal district courts have ruled that, because the Federal Rules of Civil Procedure do not provide for summary proceedings, those courts lack jurisdiction over possessory actions. See CPG Fin. I, L.L.C. v. Shopro, Inc., No. 06-3015, 2006 WL 744275, at *2-*3 (W.D. Mo. Mar. 22, 2006); Glen 6 Assocs., Inc. v. Dedaj, 770 F. Supp. 225, 227-28 (S.D.N.Y. 1991). There is, however, authority to the contrary. See, e.g., MCC Mtg. LP v. Office Depot, Inc., 685 F. Supp. 2d 939, 946 (D. Minn. 2010); Safeway, Inc. v. Sugarloaf P'ship, LLC, 423 F. Supp. 2d 531, 534-35 (D. Md. 2006); Mut. First, Inc. v. O'Charley's of Gulfport, Inc., 721 F. Supp. 281, 282 (S.D. Ala. 1989); Famous Realty v. Flota Mercante Grancolombiana, S.A., 81 F. Supp. 553, 554 (E.D.N.Y. 1948).

But even assuming that the decisions rejecting jurisdiction are correct,[5] this is not a "possessory action" of the kind established by New Hampshire law, i.e., in which the owner of a parcel of real estate is seeking to "recover possession" of it from another "holding it without right."  N.H. Rev. Stat. Ann. § 540:12.  This is an action in which the party in possession of the real estate, Flo-Pro, is seeking (in addition to damages) a declaration that it is not in default of its lease, and an injunction preventing the owner from disturbing its possession.

The defendants have not cited, nor has this court found, any case where a federal court ruled that it lacked jurisdiction over such an action--at least where, as here, the elements of diversity jurisdiction were satisfied--based on the existence of

---

[5]These decisions appear to overlook the "long-established rule that states may not limit federal jurisdiction by passing restrictive statutes."  Mullen v. Academy Life Ins. Co., 705 F.2d 971, 975 (8th Cir. 1991) (citing, inter alia, Ry. Co. v. Whitton, 80 U.S. 270, 286 (1881)); see also, e.g., 17A Wright, supra, § 4211, at 29 (calling it "black-letter law that the jurisdiction of the federal courts cannot be taken away by state statutes," subject to a "qualification" inapplicable to possessory actions) (quotation marks omitted).  So it seems doubtful that a state could deprive the federal courts of jurisdiction they would otherwise have simply by adopting summary procedures for resolving certain kinds of claims.  Because this is not a possessory action, however, this court need not decide what effect, if any, a state's adoption of summary procedures for handling those actions has on federal jurisdiction over them.

15

summary eviction proceedings under state law.[6]  As one federal
district court has observed in taking jurisdiction of a dispute
(like this one) challenging the validity of a lease termination,
"the presence of different or more expeditious procedures in
state court is not a reason to deny the existence of federal
diversity jurisdiction."  Safeway, 423 F. Supp. 2d at 534-35.

In what seems to be an argument for this court to abstain
from exercising jurisdiction even if it exists, the defendants
claim that, the summary nature of New Hampshire possessory
actions aside, "this court still lacks subject-matter
jurisdiction because the landlord-tenant relationship is
fundamentally a matter of state-law."  But that characterization
fits every diversity case, in which, by definition, a plaintiff
seeks to vindicate rights created by state (rather than federal)
law.  The court of appeals has instructed that the mere presence
of "questions of local law"--even if they are "difficult and
unresolved," which does not seem to be the case here anyway, at

_____

[6]Some courts have reasoned that a possessory action cannot,
by definition, satisfy the amount in controversy requirement for
diversity jurisdiction, at least where the plaintiff does not
have a claim for rent.  See, e.g., Harvard Real Est.-Allston,
Inc. v. KMART Corp., 407 F. Supp. 2d 317, 320-21 (D. Mass. 2005).
But, again, the defendants do not dispute that the amount in
controversy here exceeds $75,000.  (There is also contrary
authority, most notably Judge Posner's decision in BEM I, L.L.C.
v. Anthropologie, Inc., 301 F.3d 548, 553-54 (7th Cir. 2002)).

least at the moment--"would not justify abstention by a federal court properly sitting in diversity." Fragoso v. Lopez, 991 F.2d 878, 883 (1st Cir. 1993); see also Sevigny v. Employers Ins. Union of Wausau, 411 F.3d 24, 29 (1st Cir. 2005).

Indeed, the court of appeals has squarely rejected the argument that a federal district court should have abstained from exercising jurisdiction over a possessory action, observing that

> The federal district court simply enforced the [property owner's] rights . . . to gain possession of the property, rights recognized under state law. In a variety of ways, federal courts enforce rights created by state law and there was nothing unusual about the federal court doing so here. The federal court simply applied [state] law regulating the possession of real property.

FDIC v. Sweeney, 136 F.3d 216, 218-19 (1st Cir. 1998). The defendants offer nothing to explain why that reasoning does not apply with full force in this case--which, again, is not even a possessory action, but a tenant's action for a declaratory judgment that it is not in breach of the lease.[7] See Safeway,

---

[7]The defendants cite a number of federal court decisions which, the defendants say, "disclaimed jurisdiction over landlord tenant disputes." In the majority of these cases, however, the court ruled that it did not have federal question jurisdiction over the dispute in question under 28 U.S.C. § 1331. See United Mut. Houses, L.P. v. Andujar, 230 F. Supp. 2d 349, 353-54 (S.D.N.Y. 2002); Hearn v. Lin, No. 01-8208, 2002 WL 720829, at *3-*4 (E.D.N.Y. Feb. 14, 2002); Arrey v. Beaux Arts II, LLC, 101 F. Supp. 2d 225, 227 (S.D.N.Y. 2000); DiNapoli v. DiNapoli, No. 95-7872, 1995 WL 555740, at *1 (S.D.N.Y. Sept. 19, 1995); cf. McAllan v. Malatzky, No. 97-8291, 1998 WL 24369, at *2-*3

423 F. Supp. 2d at 536-37 (declining to abstain from exercising jurisdiction over a tenant's action for a declaratory judgment that its lease was not properly terminated, because it "revolve[d] around the interpretation of an ordinary commercial contract--a type of legal question that is the daily bread of a federal court sitting in diversity").  This court has diversity jurisdiction over this matter, and cannot abstain from exercising it.  The defendants' motion to dismiss is denied.

## II.   **Preliminary injunctive relief**

## A.   **Applicable legal standard**

In deciding whether to grant a motion for a preliminary injunction, a court must consider four factors:  (1) the movant's likelihood of success on the merits of his claims; (2) the risk of irreparable harm to the movant if the injunction is not issued; (3) how that harm compares to any harm the defendant

---

(S.D.N.Y. Jan. 22, 1998) (dismissing challenge to state court's resolution of landlord-tenant dispute as barred by the Rooker-Feldman doctrine), aff'd, 173 F.3d 845 (table), 1999 WL 146300 (2d Cir. Mar. 15, 1999).  So these cases are inapposite here, where, as just discussed, there is federal jurisdiction by way of diversity.  The defendants do cite one case, Glen 6, and a few cases following it without further discussion, actually ruling that a federal court should abstain from hearing a possessory action.  But that decision was based almost entirely on the fact that state law would provide the rules of decision--a rationale which, whatever else can be said of it, does not support abstention in this circuit, as just discussed.

faces if the injunction does issue, and (4) how granting or
denying injunctive relief would affect the public interest. See,
e.g., Naser Jewelers, Inc. v. City of Concord, 513 F.3d 27, 32
(1st Cir. 2008). "The sine qua non of this four-part inquiry is
likelihood of success on the merits:  if the moving party cannot
demonstrate that [it] is likely to succeed in his quest, the
remaining factors become matters of idle curiosity." New Comm
Wireless Servs. v. SprintCom, Inc., 287 F.3d 1, 8 (1st Cir.
2002); see also, e.g., Boston Duck Tours, LP v. Super Duck Tours,
LLC, 531 F.3d 1, 11 (1st Cir. 2008).  As explained below, Flo-Pro
has failed to show the requisite likelihood of success on its
claim that Iron Horse improperly terminated the lease.

**B.    Analysis**

     Flo-Pro seeks a preliminary injunction preventing the
defendants from entering or taking possession of the premises on
the theory that Iron Horse has not properly terminated the lease
on account of Flo-Pro's failure to furnish the security deposit
required by section 17.5.  As noted supra, Flo-Pro had stated in
its response to the termination notice that it "complied with
Section 17.5 of the lease in light of the delivery to [its]
former landlord of the original" letter of credit, and makes
essentially the same assertion in its complaint.  As also noted

19

supra, however, Flo-Pro conceded at the injunction hearing that Iron Horse does not have a security deposit at present.

Even without this concession, there is no likelihood that Flo-Pro could succeed on the merits of a claim that it is in compliance with section 17.5(a) by virtue of having furnished the letter of credit to Circle Drive upon the commencement of the lease.  Section 17.5(a), in relevant part, requires Flo-Pro to "maintain the issuance of a standby letter of credit . . . as security for the full and faithful performance of Tenant's obligations hereunder."  Following the assignment of the lease, Flo-Pro's "obligations" run to its new landlord, Iron Horse.  But the letter of credit for the benefit of Circle Drive does not provide security for the performance of those obligations because, as Flo-Pro acknowledges, New Hampshire's version of the Uniform Commercial Code provides that "the right of a beneficiary to draw or otherwise demand performance under a letter of credit may not be transferred."  N.H. Rev. Stat. Ann. § 382-A:5-112(a).[8] So, even though Iron Horse has physical possession of the second amended version of the letter of credit, that provides no

---

[8]There is a limited exception that applies if the letter "provides that it is transferable," but the letter of credit here makes no such provision.

security for the performance of Flo-Pro's obligations to Iron
Horse under the lease.

If there were any doubt about this reading of section
17.5(a) (and, again, Flo-Pro has not articulated any), it is
removed by the estoppel certificate and the evidence of the
parties' dealings that followed.  Prior to the assignment of the
lease, Flo-Pro stated in the estoppel certificate that it would
"arrange for [Fenwick] to facilitate the assignment/re-issuance
of the LOC to [Iron Horse] under the same terms and conditions as
currently exist."  Flo-Pro presumably would not have said this if
it believed that, despite the coming assignment of the lease to
Iron Horse, the letter of credit for the benefit Circle Drive
fulfilled Flo-Pro's obligation to provide a security deposit.
Indeed, Flo-Pro would seem to be estopped from taking that
position now, having signed the estoppel certificate.  See
Lakeview Mgmt., Inc. v. Care Realty, LLC, 2009 DNH 036, 45-47
(finding tenant estopped from arguing for a rent calculation in
litigation against its new landlord when, prior to the
assignment, the tenant had signed an estoppel certificate
attesting to a different rent calculation) (McAuliffe, C.J.).

After the assignment of the lease, Iron Horse asked Flo-Pro
to "have the issuer acknowledge the assignment to us or to have
[it] re-issue the [letter of credit] to [Iron Horse]"--just as

21

contemplated by the estoppel certificate.  Flo-Pro did not respond by taking the position (as it did later in response to the notice of lease termination) that this was unnecessary because Iron Horse was in possession of the letter of credit for the benefit of Circle Drive.  Instead, Flo-Pro told Iron Horse that Flo-Pro was working with its bank to secure a new letter of credit for Iron Horse.  There is no likelihood of success on Flo-Pro's claim (which, as just discussed, it no longer appears to be making anyway) that it is in compliance with section 17.5(a) of the lease by virtue of having provided a letter of credit for the benefit of Circle Drive, even though Flo-Pro has yet to provide a letter of credit for the benefit of Iron Horse.[9]

---

[9]At oral argument, Flo-Pro acknowledged that it was not aware of any authority that a landlord's obligation vis-a-vis the tenant's security deposit "runs with the land," so that an incoming landlord has no right to demand a security deposit from an existing tenant who tendered it to the outgoing landlord. This court's research uncovered one Massachusetts case ruling that "a commercial tenant who paid a security deposit to its original lessor is entitled to a credit for the security deposit from a successor landlord."  Sacco v. DeBon-Aire, Inc., 6 Mass. L. Rptr. 265 (Mass. Super. Ct. Nov. 1, 1996).  As Sacco observed, though, "decisions in other states are divided on this issue," with some holding that a tenant has no claim against a successor landlord for a security deposit given its predecessor.  See, e.g., Mullendore Theatres, Inc. v. Growth Realty Investors Co., 691 P.2d 970, 972 & n.2 (Wash. Ct. App. 1984) (citing cases).

And even assuming that the New Hampshire Supreme Court would follow Sacco, it would seem to apply only if (as was the case there) the tenant did not stipulate otherwise.  Cf. 3 James Charles Smith, Friedman on Contracts and Conveyances of Real Property § 12.4 (7th ed. 1991) (observing that, even in a

At oral argument, Flo-Pro suggested that the estoppel
certificate actually supported its argument that it was not in
default under the lease, because the certificate states merely
that Flo-Pro "will arrange for [Fenwick] to facilitate the
assignment/re-issuance of the LOC to" Iron Horse.  Thus, Flo-Pro
argues, it has done what it said it would do by "arranging" for
Fenwick to "facilitate" the reissuance of the letter of credit to
Iron Horse; that the reissuance has yet to occur is of no moment
and, moreover, is Iron Horse's fault, since it refuses to return
the second amended version of the letter of credit to Flo-Pro.

There are at least two problems with this argument.  First,
Iron Horse premised its notice of termination on Flo-Pro's breach
of its obligations under the lease, not on Flo-Pro's breach of
its obligations under the estoppel certificate.  Again, the lease
obligated Flo-Pro to "maintain the issuance of a standby letter
of credit . . . as security for the full and faithful performance
of Tenant's obligations hereunder"--an obligation which,

---

jurisdiction where "a grantee who takes subject to a lease is
entitled to the benefit of security given [to the grantor] to
secure performance by the tenant," that rule applies only "absent
contra stipulation").  Here, Flo-Pro stated in the estoppel
certificate, with the understanding that Iron Horse would be
relying upon the statement, that Flo-Pro would see to the
transfer or reissuance of the existing letter of credit.  Any
default rule on a successor landlord's liability for a security
deposit given its predecessor, then, is not helpful to Flo-Pro's
motion for a preliminary injunction.

following the assignment of the lease to Iron Horse, required a letter of credit for the benefit of Iron Horse, as just discussed.  Flo-Pro does not explain how it satisfied this obligation as lessee merely by "arranging to facilitate" the reissuance of the letter of credit to Iron Horse.[10]

Second, this court cannot find that Flo-Pro did in fact "arrange for [Fenwick] to facilitate the assignment/re-issuance of the LOC to" Iron Horse anyway.  The evidence received at the preliminary injunction hearing shows that Fenwick could have obtained a letter of credit for the benefit of Iron Horse simply by providing its bank with $150,000 in collateral, but that Fenwick refused to do so.  This refusal was not based on any want of means--indeed, Flo-Pro stated at the hearing that it would be able to post a bond in the sum of $150,000, should the requested injunction issue, see Fed. R. Civ. 65(c)--but on its view that it should not have to post collateral for a letter of credit benefitting Iron Horse until it surrenders the letter of credit

---

[10]Nor does Flo-Pro argue that the estoppel certificate amounted to a modification of section 17.5(a).  Indeed, the certificate specifically stated that the lease had not been "modified or changed in any way, whether in writing or orally." See J.G.M.C.J. Corp. v. Sears, Roebuck & Co., 391 F.3d 364, 369 & n.3 (1st Cir. 2004) (ruling that an estoppel certificate, even when integrated with other documents, did not amend a lease, in part because the certificate stated that the lease had not been amended) (applying New Hampshire law).

benefitting Circle Drive.  As discussed _infra_, though, that view is incorrect.

Moreover, following the assignment of the lease to Iron Horse, Flo-Pro simply ignored a number of Iron Horse's requests for information about the re-issuance of the letter of credit. Flo-Pro also provided Iron Horse with information that was at best inaccurate and at worst misleading:  that the letter of credit benefitting Circle Drive expired on October 29, 2010, when in fact it did not expire until December 31, 2014, and that Fenwick was "in the process" of returning the "original LC" to RBC, when in fact it was in the midst of efforts to obtain the second amended version of the instrument from Circle Drive without telling Iron Horse.  In light of this evidence, this court concludes that Flo-Pro is not likely to succeed on any claim that it "arrange[d] for [Fenwick] to facilitate the assignment/re-issuance of the LOC to" Iron Horse, as was stated in the estoppel certificate (even assuming, contrary to the court's view, that Flo-Pro's compliance with this provision of the estoppel certificate would somehow excuse its breach of section 17.5(a) of the lease).

Finally, as just mentioned, Flo-Pro argues that the only reason it has yet to obtain a letter of credit benefitting Iron Horse--and thus failed to furnish the security deposit required

25

by the lease--is that Iron Horse has refused to return the second amended version of the letter of credit benefitting Circle Drive. New Hampshire follows the rule that "if it can be shown that the performance of the contract was prevented directly or indirectly by the act of the promisee, its nonperformance will be excused." Famous Players Film Co. of New Eng. v. Saloman, 79 N.H. 120, 122 (1918).  Under this rule, as described by one leading commentator,[11] "[p]revention of the promisor's performance may result in a discharge even though the promisee's conduct is in itself neither unjust nor in bad faith."  13 Arthur Linton Corbin, Corbin on Contracts § 68.7, at 243-45 (Joseph M. Perillo, ed., rev. ed. 2003).

As this statement suggests, the "determination of what constitutes wrongful prevention does not depend on any mechanical rule," but takes into account "the commercial setting, the ethical position of the parties, the probable understanding they would have reached had they considered the matter, and many other factors."  Joseph M. Perillo, Perillo and Calamari on Contracts § 11.28, at 395 (6th ed. 2009) (footnote omitted).  Nevertheless, "when the promisee's inaction is not a violation of an express or

---

[11]Aside from Famous Players (and a few mid-nineteenth century cases it cites), there does not appear to be any New Hampshire case law discussing or applying the rule.  Flo-Pro has not cited any supporting case law from any jurisdiction.

implied duty or is consistent with the justified expectations of the parties as of the time of contracting, inaction by the promisee is unlikely to be held to discharge the promisor's duty."  13 Corbin, <u>supra</u>, § 68.7, at 245.

These statements are consistent with New Hampshire law that "[i]n every agreement there exists an implied covenant that each of the parties will act in good faith and deal fairly with the other."  <u>Richard v. Good Luck Trailer Court, Inc.</u>, 157 N.H. 65, 70 (2008) (quotation marks omitted).  As is relevant here, the covenant serves "to prohibit behavior inconsistent with the parties' agreed-upon common purpose and justified expectations, as well as with common standards of decency, fairness and reasonableness."  <u>Livingston v. 18 Mile Point Drive, Ltd.</u>, 158 N.H. 619, 624 (2009) (quotation marks omitted).

Here, Iron Horse's refusal to return the second amended version of the letter of credit benefitting Circle Drive was neither a breach of Iron Horse's express or implied duties, under the lease or otherwise, nor inconsistent with the parties' justified expectations.  Rather, it was consistent with both. First and foremost, section 17.5(b) of the lease expressly addresses what happens to Flo-Pro's security deposit upon assignment of the landlord's interest in the lease:

> Should Landlord convey its interest under this Lease
> and such grantee or transferee acknowledges in writing
> that it is bound by the terms of this Lease in respect
> of the application and return of the said Security
> Deposit, Landlord may turn over the Security Deposit to
> its grantee or transferee.

It is undisputed that, as contemplated by this provision, Iron
Horse acknowledged in writing that it was bound by section 17.5
of the lease following the assignment, and that Circle Drive
turned over physical possession of the letter of credit serving
as the security deposit (though, erroneously, not the second
amended version) to Iron Horse.

In light of this provision, it is nearly impossible to see
how Iron Horse had any obligation--or Flo-Pro had any legitimate
expectation--that Iron Horse would provide Flo-Pro with the
Circle Drive letter of credit.[12]  Cf. Richard, 157 N.H. at 70-71
(ruling that, by selling the property to a third party,
defendants did not breach the covenant of good faith and fair
dealing in the purchase and sale agreement with plaintiff,
because it specifically referenced their obligation to entertain
an offer from the third party, so "plaintiff's 'justified

---

[12]It also worth noting that a letter of credit's applicant,
like Fenwick here, has no "legally cognizable right" in the
instrument.  Am. Fed. Group, Ltd. v. Rothenberg, No. 91-7860,
1998 WL 273034, at *9 (S.D.N.Y. May 28, 1998).

28

expectations' necessarily included that the defendants might sell the [property] to the [third party]").

Second, the estoppel certificate also spells out the parties' respective obligations as to the security deposit following the assignment of the lease:  Flo-Pro, again, "will arrange for [Fenwick] to facilitate the assignment/re-issuance of the LOC to [Iron Horse] under the same terms and conditions as currently exist," and Iron Horse will "acknowledge[] in writing that it is bound by the terms of the Lease in respect of the application and return of the Security Deposit as defined and contemplated in the Lease."  Like the lease, the estoppel certificate places only one responsibility on Iron Horse relative to the security deposit--that it acknowledge that it is bound by section 17.5, which it did.  So, like the lease, the estoppel certificate does not state, or fairly imply, that Iron Horse will, as a further condition of obtaining a letter of credit for its benefit, provide Flo-Pro with the Circle Drive letter.

Third, Flo-Pro has not pointed to any other evidence of its dealings with either Circle Drive or Iron Horse that could have reasonably given rise to an expectation that the Circle Drive letter of credit would be returned to Flo-Pro.  Rather, when Flo-Pro initially asked Iron Horse to have the instrument back, it explained only that this "would be convenient."  After ignoring

Iron Horse's repeated inquiries about that process, Flo-Pro eventually stated that it would simply obtain a new letter of credit from RBC when the old one expired, and then that it would simply obtain a new letter of credit from a different bank--both times without even asking for the return of the old letter of credit.  Indeed, Flo-Pro did not renew its request for the old letter of credit until it received a notice of default from Iron Horse and, once again, this request was unaccompanied by any suggestion of a mutual (or even a unilateral) understanding that Iron Horse was to have returned the letter of credit to Flo-Pro.

Of course, Iron Horse did eventually accede to Flo-Pro's request to give that instrument back, but did so only while maintaining that it had no obligation to do so.  Then, Iron Horse learned that there was a second amended version of the Circle Drive letter of credit, still in effect, which Flo-Pro had been trying to obtain from Circle Drive without telling Iron Horse. In light of this revelation, if nothing else, it would have been unreasonable to expect Iron Horse to surrender the second amended version of the Circle Drive letter of credit to Flo-Pro, because, as Iron Horse explains, it had reason to fear that Flo-Pro intended to use the collateral for purposes other than obtaining a new letter of credit for Iron Horse.  Naturally, even "[w]here duties of cooperation are implied" between contracting parties as

30

a basis for invoking the prevention doctrine, "only reasonable
efforts are required."  Perillo, supra, § 11.28, at 396; see also
Restatement (Second) of Contracts § 245 cmt. a (1981) (stating
that no breach of a promisee's implied duty to cooperate in the
promisor's performance occurs "if the lack of cooperation is
justifiable").  On this record, Iron Horse's attempts to
cooperate with Flo-Pro in getting a new letter of credit appear
reasonable, and its ultimate refusal to release the second
amended version of the letter of credit appears justifiable.
These actions were not at odds with "common standards of decency,
fairness and reasonableness."  Livingston, 158 N.H. at 624.

Based on this history--and, more importantly, the lease and
the estoppel certificate themselves--the court finds Flo-Pro
unlikely to succeed on any claim that it was relieved of its
obligation to comply with section 17.5(a) because Iron Horse
prevented it from performing.  To the contrary, the evidence
shows:  that the lease contemplated that Circle Drive would turn
the letter of credit over to Iron Horse upon the assignment of
the landlord's interest in the lease; that the estoppel
certificate contemplated that Flo-Pro would bring about an
assignment or re-issuance of the letter of credit to Iron Horse,
which did not have to do anything but acknowledge its commitment
to section 17.5 of the lease; that, despite its many

31

communications with Iron Horse, Flo-Pro did not announce, until
its response to the termination notice, any expectation that Iron
Horse would return the Circle Drive letter of credit; and that
Iron Horse was nevertheless willing to surrender the letter of
credit until learning that Flo-Pro had misstated that the
instrument had expired and concealed its efforts to get the
unexpired version directly from Circle Drive.

Flo-Pro has not shown anything approaching either "wrongful
prevention" or a breach of the implied covenant of good faith and
fair dealing on the part of Iron Horse in refusing to return the
Circle Drive letter of credit and, therefore, has not excused its
demonstrated--and acknowledged--failure to provide the security
deposit required by section 17.5(a) of the lease.  Accordingly,
Flo-Pro has not shown the requisite likelihood of success on the
merits of its claim that Iron Horse wrongfully terminated the
lease and, for that reason alone, is not entitled to a
preliminary injunction preventing the defendants from entering or
taking possession of the premises.[13]  See, e.g., New Comm
Wireless Servs., 287 F.3d at 8.  The court therefore need not

_____

[13]This is not to suggest that the defendants have any
greater rights to enter or take possession of the premises than
those provided by the lease and New Hampshire law.

consider the other factors normally in play in deciding whether to issue a preliminary injunction.  See id.

## III. Conclusion

For the foregoing reasons, the defendants' motion to dismiss for lack of subject-matter jurisdiction[14] is DENIED, and Flo-Pro's motion for a preliminary injunction[15] is DENIED.  The defendants shall file an answer to the verified complaint within 14 days of the date of this order.  See Fed. R. Civ. P. 12(a)(4)(A).  The court will not conduct a preliminary pretrial conference in this matter.  Instead, counsel shall confer and submit a joint discovery plan for the court's consideration within 30 days of the date of this order.  The joint discovery plan shall comply with Fed. R. Civ. P. 26(f)(3) and L.R. 26.1.

SO ORDERED.

_____
Joseph N. Laplante
United States District Judge

Dated:  September 28, 2011

---

[14] 19.

[15]Document no. 2.

```
cc:  William J. Amann, Esq.
     George W. Tetler, III, Esq.
     Louis M. Ciavarra, Esq.
     Mark W. Powers, Esq.
     Sheliah M. Kaufold, Esq.
```